IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOROTHY MURPHY,

                    Plaintiff,

                                        Case No. 09 C 7929

          v.

MICHAEL J. ASTRUE,                      Hon. Harry D. Leinenweber
Commissioner of Social
Security,

                    Defendant.

MEMORANDUM OPINION AND ORDER

Plaintiff Murphy moves for summary judgment on her action
for judicial review of an adverse decision of the Commissioner of
Social Security. Plaintiff's motion is denied and the
Commissioner's final decision is affirmed.

I.   BACKGROUND

A.   Procedure

Murphy filed applications for Disability Insurance Benefits
and Supplemental Security Income in October 2005. These
applications were denied initially in February 2006, and denied
upon reconsideration in May 2006. Murphy requested a hearing, and
appeared before Administrative Law Judge Michael McGuire ("ALJ")
with counsel on August 7, 2008. The ALJ issued an opinion on
September 18, 2008, denying Plaintiff's applications. The Appeals
Council denied Murphy's request for a review, so the ALJ's
decision became the Social Security Agency's final decision.

Murphy then filed the present case seeking judicial review of this final decision.

## B. Facts

### 1. ALJ's Decision

When reviewing Murphy's claim, the ALJ performed the required five step inquiry: (1) whether the claimant is doing substantial gainful activity; (2) whether she has a severe impairment; (3) whether the impairment(s) meet or equal one listed by the Commissioner; (4) whether the claimant can perform her past relevant work; and if not (5) whether a significant number of other jobs exist in the national economy that claimant could perform. *See* 20 C.F.R. § 404.1520.

Murphy's applications alleged a disability onset date of March 22, 2000. As to the first step of the inquiry, the ALJ noted that Murphy was employed through approximately July 2005 such that she was engaging in substantial gainful activity and not eligible for disability benefits. This finding has gone unchallenged by Murphy, so the judicial review will focus on the evidence in the case concerning whether Murphy was disabled after July 2005.

On the second step of the inquiry, the ALJ found that Murphy had the following severe impairments: irritable bowel syndrome, a limited ability to read and write, and pain in her lower back, left knee, left elbow, and right shoulder. The ALJ also found

that Murphy suffered from depression, but decided that this impairment was not severe and did not cause more than a minimal limitation in performing basic work activities.

On the third step of the inquiry, the ALJ found that these impairments, taken together, did not meet or equal one of the Commissioner's listed impairments. He found that Murphy's musculoskeletal impairments were not severe enough to interfere with basic activities such as walking or performing both fine and gross movements. He found that Murphy's irritable bowel syndrome was not severe enough to result in a marked impairment, such as interference with nutrition, recurrent lesions, complications of disease, or recurrent obstruction.

Before the next step in the inquiry, the ALJ had to determine Murphy's residual functional capacity ("RFC"). The ALJ decided that Murphy was capable of performing light work comprised of simple tasks with limited reading and math requirements, but Murphy can only sit/stand twenty minutes at a time, lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk for six hours and sit for six hours in an eight hour workday.

On the fourth step of the inquiry, the ALJ considered Murphy's RFC and determined that she was unable to perform her "past relevant work as a certified nurses' aide" ("CNA") on a full-time basis.

This led the ALJ to the fifth and final step in the inquiry, at which stage he determined that there are jobs that exist in significant numbers in the national economy that Murphy can perform, given her RFC. Specifically, he found that Murphy was able to perform the jobs of officer helper and information clerk, and thus was not disabled as defined in the Social Security Act.

## 2. Employment History

From 2000-2005, Murphy worked as a CNA until she was laid off from her full time job in July 2005. From November 2006 to the time of the hearing in 2008, Murphy was employed on a part-time basis as a CNA. She worked on Saturday and Sunday each week for a total of fifteen hours per week. Murphy testified that her employer was pleased with her performance. She requested full-time placement with this employer upon beginning work in November of 2006, but this request had not yet been granted at the time of the hearing. Murphy said that her employer promised she would get more work, but this additional work never materialized. Murphy believed that the additional hours were held up because of a Worker's Compensation claim she made for an on-the-job injury. Murphy looked for a new job, but did not manage to acquire one.

## 3. Treating Physician

Dr. Woodard was Murphy's treating physician and completed a "Residual Functional Capacity Questionnaire" for the ALJ's consideration. Woodard found that Murphy suffered from depression

and that this condition would result in moderate limitations in her ability to deal with normal work stress. Woodard diagnosed Murphy with irritable bowel syndrome and back, shoulder, and knee pain. Woodard's RFC recommendation included the following limitations: Murphy be permitted to change at will between sitting, standing, and walking, receive unscheduled bathroom breaks, require occasional lifting of a maximum of twenty pounds, require frequent lifting of a maximum of ten pounds, and that Murphy sit/stand/walk less than a total of two hours in an eight hour workday. Woodard estimated that Murphy would be absent from work more than three times a month on average as a result of her impairments.

The ALJ adopted Woodard's RFC requirement that Murphy be permitted to change at will between sitting, standing, and walking, and a few other limitations, but did not adopt the RFC requirement that Murphy sit/stand/walk less than two hours in an eight hour workday.

### 4. Independent Psychiatric Evaluation

The Administration ordered an independent psychiatric examination of Murphy, which was done by Dr. Radomska on January 25, 2006. Radomska spent forty-five minutes obtaining Murphy's history and performing the examination. Radomska found that Murphy "has several stressors at the work place, finances, her family and landlord," and Murphy was "irritable, preoccupied with

her problems" and had "some paranoid ideas" about her landlord and husband acting against her. Radomska's diagnosis was of a "possible adjustment disorder with depressed mood and possible delusional disorder." Radomska gave Murphy a GAF score of 40-45.

The ALJ did not give controlling weight to this opinion, because it was based on a one-time consultation and was not supported by the record as a whole, and in particular it was not supported by Murphy's past and current employment as well as MURPHY's denial that she was depressed.

### 5. *Disability Determination Services*

Dr. Glen of Disability Determination Services reviewed the record and the reports of both Woodard and Radomska to produce an RFC assessment. In this assessment, he opined that Murphy's history did not support a strong diagnosis of a severe mental impairment, and instead the primary issue may be an irritable and demanding personality. Glen found that Murphy was capable of simple unskilled work but recommended against working with the public.

Dr. Kenney, also of Disability Determination Services, added his opinion that Dr. Woodard's RFC assessment was essentially accurate with the exception of certain limitations that he felt "do not appear to be based on anything more than the claimant's subject complaints." Kenney specifically pointed out the ability to neither sit nor stand/walk more than two hours per work-day as

an example of one of these limitations. Kenney found that Murphy was capable of work with certain physical limitations, such as limited lifting and flexibility between sitting and standing.

The ALJ adopted these opinions and incorporated them into his RFC with the exception of the recommendation against working with the public.

### 6. *Murphy's Hearing Testimony*

Murphy's testimony at the hearing consisted of her describing her physical ailments, daily activities, and employment history. The ALJ's decision on Murphy's physical impairments corresponds with Murphy's testimony, so there is no need for further detail on that point. Murphy provided little information on her mental condition. The ALJ inquired as to whether she was being treated for depression, to which Murphy responded: "No, I'm not being treated for depression. That was - they had me messed up with my sister, Diane." Murphy explained the error in the record where Murphy had been confused for her sister Diane, who had been checked into Bethany Hospital, presumably for mental health services, as an inpatient at one time (MURPHY had not). Murphy testified that she is not on any medication for depression, and last took some around 2002 when she was out on leave for a back injury. The ALJ inquired as to whether she had trouble getting along with others, and Murphy said "I don't have a problem getting along with people. It seems

like people get - have a problem getting along with me because they – I simply am one of the nicest persons you can meet." She followed up with "all of the residence is fond of me and everything . . . . I get along with anybody."

As to her daily activities, Murphy uses CTA buses for transportation and takes the stairs to her second story apartment because the building has no elevator. Murphy testified that she helps with some household chores, such as dishes and laundry, but that her three teenage children do some of the chores as well. Murphy is currently enrolled in a GED class.

Murphy testified that she was sometimes absent from her current part-time employment when she started, but that she has had steady attendance since then. She says that her employer is pleased with her work and has had no issues. Overall, she only mentioned one disciplinary incident at work that occurred a few years before the hearing. This was an insubordination incident that Murphy claims occurred when she complained about having to do work that a prior shift was supposed to handle.

### 7. *Vocational Expert*

Glee Ann Kehr acted as the vocational expert ("VE") in the hearing. The ALJ described RFC limitations to Kehr that were very similar to his final decision, including light, unskilled work, with flexibility between sitting and standing. Kehr testified that these limitations would preclude her past relevant work as a

CNA. Next, the ALJ asked how many jobs there were that required no social contact, to which Kehr replied there were none. The ALJ then asked how many jobs there were if social contact was permitted, and Kehr replied that there were thousands of jobs in a few categories, and if limited reading and math skills were a limitation, more specifically around 4300 positions as an office helper and 4700 positions as an information clerk.

## II. LEGAL STANDARD

An individual may seek review of the final decision of the Commissioner of Social Security in the district court in which the individual resides. 42 U.S.C. § 405(g). The courts apply a deferential standard of review. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "[T]he agency's findings of fact are conclusive so long as substantial evidence supports them and no error of law occurred." *Id.*; 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citations and quotations omitted). The court looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

Since an ALJ is in the best position to determine the credibility of witnesses, the court will "overturn a credibility

determination only if it is patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, the credibility determination "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* The ALJ must be affirmed if the decision is adequately supported, even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder*, 529 F.3d at 413.

### III.  <u>ANALYSIS</u>

Plaintiff challenges the final decision of the Commissioner of Social Security as improper based on six different errors: (1) finding no severe mental impairment, (2) finding that Plaintiff could interact with the public, (3) adopting Dr. Glen's opinion without accounting for the entire opinion, (4) finding Plaintiff capable of full-time work, (5) finding Plaintiff not credible, and (6) failing to comply with SSR 00-4p.

### A. Mental Impairment

Plaintiff complains that "[d]espite evidence of a mental impairment . . . the ALJ found that Ms. Murphy had no mental impairment or related limitations." Plaintiff notes that both Radomska and Woodard indicated that Plaintiff suffered from depression, and that Radomska's report included evidence that Plaintiff suffered from delusions and paranoid ideas. Plaintiff

claims that the ALJ did not have sufficient contrary evidence to disregard the opinions of these two doctors.

Contrary to Plaintiff's brief, the ALJ did not find that Plaintiff had no mental impairment. Instead, the ALJ evaluated the evidence and found that Plaintiff had a mental impairment of depression, but that this impairment was not severe. Plaintiff's contention on this issue must be rephrased to state that the ALJ improperly evaluated the *severity* of Plaintiff's mental impairment as "not severe."

The ALJ must have had sufficient evidence for this finding such that there is an accurate and logical bridge from the evidence to the ALJ's decision. The ALJ relied on a number of pieces of evidence to reach this conclusion when he discussed depression in step two of the inquiry and when he rejected medical opinions that suggested a severe mental impairment. The ALJ cited to Plaintiff's own testimony on the issues of depression, life activities, and work performance. Plaintiff testified that she was not being treated for depression and had not taken any drugs for depression for years, and that there had been some confusion between her and her sister, who seems to have been treated for depression. Plaintiff also testified that she functions fairly normally in life activities, sleeping eight hours a night, and performing at least some chores around the house. Plaintiff has performed well at work for years, and has

not garnered any complaints regarding her performance (except for one for insubordination). The ALJ cited to the record as a whole, and in particular Plaintiff's testimony, as demonstrating that Plaintiff may have mild concentration limitations, but does not have a severe mental impairment of depression.

Plaintiff suggests that the ALJ should have relied on other evidence in his determination and that he simply ignored some evidence. As to the first suggestion, a reviewing court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). As to the second suggestion, Plaintiff's own brief acknowledges that an "ALJ is not required to address every piece of evidence or testimony in the record." Pl. Br. at 4 (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

Plaintiff's specific arguments can be addressed individually. Plaintiff claims that the ALJ's rejection of Radomska's report because Radomska examined Plaintiff on only one occasion was improper. Read more closely, it appears that the ALJ was instead correctly pointing out that the opinion could not be *controlling* because it was based on a one-time examination. Plaintiff misconstrues this as a rejection of the opinion merely because it was a one-time examination. An ALJ can give controlling weight to the opinions of *treating* physicians, which

Radomska was not because it was a one-time examination. *See* 20 C.F.R. § 404.1527(d)(2).

Plaintiff complains that Radomska's report brings up objective evidence of mental impairments that cannot be rejected without citing conflicting evidence in the record. Without assuming the truth of this proposition, the ALJ did reference conflicting evidence. Most importantly, he referenced Plaintiff's own testimony as contradicting a finding of any severe impairment. The ALJ also adopted Glen's opinion which found no severe mental impairment and claimed that no strong diagnosis of depression could be founded on the slim evidence compiled on Plaintiff.

Plaintiff also claims that, for Radomska's opinion, the ALJ was required to discuss, pursuant to 20 C.F.R. § 404.1527(d), (1) whether the doctor examined Plaintiff, (2) whether the doctor treated Plaintiff, (3) whether the doctor's opinion is supported by medical signs or laboratory findings, (4) whether the opinion is consistent with the record as a whole, (5) the doctor's specialization, and (6) any other relevant factors. The ALJ noted in his decision that Radomska was the psychiatric consultative examiner who examined Plaintiff on January 25, 2006. This statement alone recognizes items 1, 2, and 5 above. The ALJ then discussed how the opinion was not supported by the record as a whole and gave examples, which recognizes item 4 above. That

leaves item 3, medical signs, which he considered when he adopted Glen's opinion which addressed the medical signs and found that they were insufficient to sustain a strong diagnosis of depression. Finally, Plaintiff argues that the ALJ made an independent medical determination of no severe mental impairment, but this simply is not true. He explicitly adopted Glen's opinion, which found a serious psychiatric problem unlikely in the "absence of significant psychiatric [treatment] and the absence of family [history]."

A reasonable mind would accept the evidence in this case as adequate to support a conclusion of a mild, not severe, mental impairment, so the ALJ did not err on this issue.

## B. Public Interaction

Plaintiff's second issue with the final decision is that the ALJ's RFC did not include a limitation on interaction with the public. Plaintiff claims that the ALJ may not adopt Glen's opinion without addressing the limitation Glen included on interacting with the public. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

The ALJ did adopt Glen's opinion, which stated that Plaintiff "could not work well with the public but otherwise is able to do simple, unskilled work." While Plaintiff claims the ALJ did not address Glen's recommended limitation, the ALJ's decision recognized this exact limitation when it stated: "There

is also some mention of an inability to get along with others."
In response, the ALJ lists two pieces of evidence contradicting a
limitation on public interaction: Plaintiff denies having an
inability to get along with others and her work history supports
this denial.

In response to the direct question of "Do you have a problem
getting along with people?", Plaintiff testified: "No, I don't
have a problem getting along with people. . . . And all of the
residence is fond of me and everything." Plaintiff points out
that she also said "It seems like people get - have a problem
getting along with me because they - I simply am one of the
nicest persons you can meet." While a rational person could
interpret this part of her answer to mean that Plaintiff does
have a problem getting along with other people, it could just as
easily have been a poorly phrased remark that Plaintiff retracted
as she realized it was not what she meant. The ALJ was certainly
not being unreasonable when he relied on her clear and
unequivocal statement that she could get along with people over a
partially retracted statement that could contradict it.

This interpretation is supported by Plaintiff's work
history. The ALJ noted that Plaintiff worked as a CNA, which
requires public contact, for years. During this time there was no
evidence in the record of any difficulties getting along with the
public except for one incident of insubordination. Plaintiff

testified that her clients were fond of her. The ALJ's reliance on what Plaintiff has experienced in the real world in regards to interacting with the public seems to be reasonable when the alternative is simply the recommendation of medical experts. Further, it was entirely appropriate for the ALJ to consider non-medical evidence in determining the RFC since "the final responsibility for deciding [the RFC] is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (in determining the RFC, the ALJ may consider "claimant's own statement of what he or she is able or unable to do."). The ALJ's discussion of this limitation was concise, but it was clear and on review this Court can determine the rationale for his decision.

Plaintiff also suggests that the ALJ failed to discuss the testimony of the vocational expert that there are no jobs available for a person with Plaintiff's limitations if they could not work with the public. *See Griffin v. Massanari*, No. 00 C 7109, 2001 WL 1064476, at *10 (N.D. Ill. Sept. 13, 2001). Plaintiff errs here in assuming that the ALJ needed to discuss this portion of the VE's testimony. The ALJ posed two hypothetical situations to the VE: one in which his RFC included a limitation on working with the public, and one in which his RFC did not include such a limitation. The ALJ was garnering testimony from the VE so that, no matter how he decided the RFC,

he would have her expertise on the final step of the analysis where he determines if jobs are available. The ALJ ended up choosing the RFC without the limitation on public interaction, so there was no need to discuss the VE's testimony on an RFC he did not adopt.

## C. Dr. Glen's Opinion

Plaintiff's third issue with the final decision is that the ALJ adopted Glen's opinion, but did not adopt the opinion in its entirety or address limitations identified in the opinion. In particular, Glen opined that Murphy had moderate difficulties in social functioning and concentration, persistence or pace, mild difficulties in activities of daily living, and had suffered one or two episodes of decompensation. Glen also opined as to RFC limitations that Murphy was moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. Plaintiff claims that the ALJ erred in not addressing these findings.

Plaintiff's argument on this point is mostly redundant. In the previous sections, this Court rejected Plaintiff's argument about the ALJ's mental impairment finding and social impairment

finding. Since sufficient evidence supported the ALJ's finding on these two issues, and there was an accurate and logical bridge from the evidence to his finding, this Court will not upset the ALJ's finding. Citing to the facts in Glen's report does not change the analysis on these issues as it is just another set of facts that the ALJ found less persuasive than those he relied on.

The new portion of Plaintiff's argument is that Glen's opinion sets out some other limitations that are not reflected in the ALJ's RFC. The problem with this line of reasoning is that Glen opines to some limitations in concentration and the ability to do complex tasks, but Glen himself finds that even with these limitations Murphy "is able to do simple, unskilled work." The ALJ adopted this limitation in his RFC. Plaintiff cannot claim that the ALJ erred by failing to interpret the limitations that Glen identified as more serious than Glen himself believed. Glen's limitation of simple unskilled work adequately captured all of his earlier observations and so the ALJ did not ignore his findings when he used the limitation of simple unskilled work.

### D. Full-Time Work Capability

Plaintiff's fourth issue with the final decision is that the ALJ found that Plaintiff was capable of full-time work despite the opinion from Woodard that Plaintiff would miss three days of work a month based on her impairments. The VE testified that missing more than one day of work per month would preclude

competitive employment, so Plaintiff claims that the ALJ failed to address this problem.

The ALJ did not accept Woodard's opinion and instead relied on the opinions from two consultants with Disability Determination Services. Woodard did not reference any objective medical evidence that would support his assessment of the days Plaintiff would miss. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). The opinions of Glen and Kenney did not mention any limitation requiring Plaintiff to miss work each month, and instead found her capable of work. The ALJ's decision to rely on the opinions of Glen and Kenney over the opinion of Woodard is supported by evidence in the record as well. Plaintiff testified that her employer was pleased with her work performance and that her attendance was steady after a few absences which occurred shortly after she began her job in 2006.

Plaintiff argues that the ALJ's rejection of the opinion due to its incompatibility with Plaintiff's work experience was an error because Plaintiff's ability to work fifteen hours a week was "not evidence that she could perform work on a full-time basis." Plaintiff is correct in that she would miss more days if she was working five days a week instead of two, but is incorrect in arguing that her past attendance has no evidentiary value. If Plaintiff had a substantial number of "bad days" in which her impairments precluded work, it is statistically unlikely that

these days never fell on Saturday or Sunday, the days she did work. A more likely explanation is that there were a few days in which Plaintiff's impairments were so bad that she was unable to work. Therefore, Plaintiff's attendance record does support the ALJ's finding of a capability to perform full-time work. A reasonable person can find the medical opinions and attendance evidence as adequate support of the ALJ's conclusion, so the ALJ's decision that Plaintiff was capable of full-time work was not in error.

## E. Plaintiff's Credibility

Plaintiff's fifth issue with the final decision is that the ALJ did not find Plaintiff's testimony credible, but failed to properly explain what statements he discounted and why he discounted them.

The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." The ALJ then discussed the medical opinions in the case. The ALJ did not claim to doubt the existence of any symptoms, but instead specifically doubted the "intensity, persistence and limiting effects" of these symptoms. In other words, the ALJ found that Plaintiff was exaggerating the symptoms. The Seventh Circuit noted that claimants have an incentive to exaggerate

their symptoms and an ALJ is free to discount such exaggerations. *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). Judicial review is particularly deferential in the area of credibility as only the ALJ was present to witness the live testimony. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong, and deserving of reversal." *Elder*, 529 F.3d at 413 (quotations and citations omitted).

In this case, the ALJ essentially found Plaintiff's symptoms to be less severe than Plaintiff claimed based on the medical opinions of Disability Determination Services. Plaintiff argues that this credibility finding is not specific enough, but the ALJ specifically discounted those statements regarding the *extent* and *effect* of her symptoms and did not merely state that Plaintiff was "not entirely credible." *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

As to his support for this credibility finding, the ALJ's approving reference to the reports of Glen and Kenney made his basis clear. These reports mention that Plaintiff is described as both "demanding" and "untruthful" and that the FO report includes the suggestion that claimant is not truthful. The reports then come to the conclusion that her symptoms are not as severe or debilitating as Plaintiff claims. The ALJ also made repeated mention of Plaintiff's current work experience and desire for

full-time experience as an indication that her symptoms were not highly debilitating. The ALJ's credibility determination was specific, had an explanation, and was supported by evidence so it will not be reversed.

### F. SSR 00-4p

Plaintiff's last issue with the final decision is that the ALJ failed his "affirmative responsibility to ask about any possible conflict between [VE] evidence and information provided in the [Dictionary of Occupational Titles]." *See Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (reviewing the requirements of SSR 00-4p).

In the present case, the ALJ posed two hypothetical RFC determinations to the VE and elicited testimony on the number of jobs available under each RFC. The VE testified that the jobs of officer helper and information clerk were matches for the RFC that the ALJ eventually determined was appropriate for Plaintiff. Defendant acknowledges at this point that "the ALJ did not ask about a conflict," and that Plaintiff is correct that SSR 00-4p was violated.

If SSR 00-4p was violated, the analysis turns to whether the error is harmless. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Defendant maintains that the error is harmless because the Dictionary of Occupational Titles ("DOT") description for officer helper matches Plaintiff's RFC. This match makes the error

harmless because, regardless of whether the VE or DOT description was proper, Plaintiff would still be able to work as an officer helper. Plaintiff agrees that the DOT description for an officer helper indicates a reasoning level of two, but argues that this reasoning level is inconsistent with an RFC that requires simple unskilled jobs. In a very similar situation, the Seventh Circuit found that a job with a reasoning level of three was appropriate for a former CNA with a capacity only to perform "simple" work and "follow simple instructions." *Id.* at 478. If a job requiring a reasoning level of three is consistent with simple work, then a job which requires a reasoning level of two should also be consistent with a job requiring simple work. In the present case, there is no conflict between the DOT description of officer helper and the Plaintiff's RFC. The SSR 00-4p error was therefore harmless and the ALJ's decision will not be reversed on this ground.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied and the Commissioner's final decision is affirmed.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:**     8/31/2010